UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 22-10242-RGS

CAPTAIN ALBERT BROX et al.

v.

THE WOODS HOLE, MARTHA'S VINEYARD, AND
NANTUCKET STEAMSHIP AUTHORITY and
JANICE KENNEFICK

MEMORANDUM AND ORDER ON
PLAINTIFFS' RENEWED MOTION FOR
PRELIMINARY INJUNCTIVE RELIEF

March 10, 2022

STEARNS, D.J.

Plaintiffs, who are employees of the Woods Hole, Martha's Vineyard, and Nantucket Steamship Authority (the Authority), seek preliminary injunctive relief from the Authority's policy mandating vaccination against COVID-19 as a condition of their continued employment. The Authority's policy, according to plaintiffs, violates their statutory and constitutional rights. After careful review of the parties' briefs, the court will <u>DENY</u> plaintiffs' motion for injunctive relief.

## BACKGROUND

Since its detection in late 2019, the outbreak of SARS-CoV-2 (COVID-19) has metamorphosized into the deadliest worldwide pandemic since the 1918 outbreak of Spanish flu. As of the date of this order, COVID-19 has caused the deaths of over six million persons worldwide, including 959,533 Americans, 22,944 of whom are citizens of the Commonwealth of Massachusetts.

To protect against the spread of COVID-19 and to reduce the risk of severe illness and death for persons infected with the virus, the Food and Drug Administration (FDA) has given full approval to two COVID-19 vaccines manufactured by the pharmaceutical companies Pfizer/BioNTech and Moderna. "Full FDA approval takes place when enough data demonstrate that the vaccines are safe and effective for most people who receive them, and when the FDA has had an opportunity to review and approve the whole vaccine manufacturing process and facilities."[1] The

---

[1] Maragakis & Kelen, *Full FDA Approval of a COVID-19 Vaccine: What You Should Know*, Johns Hopkins Med. (Feb. 14, 2022), https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/full-fda-approval-of-a-covid-19-vaccine-what-you-should-know. The FDA has also given emergency use authorization to Johnson & Johnson's Janssen COVID-19 vaccine. *See Janssen COVID-19 Vaccine*, US Food & Drug Admin., https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/janssen-covid-19-vaccine (last visited March 9, 2022).

Centers for Disease Control and Prevention (CDC) states that "[p]eople who are up to date on vaccines, including booster doses when eligible[,] are likely to have stronger protection against COVID-19 variants," including the now-dominant omicron variant. Kennefick Decl. (Dkt # 16) Ex. E at 62.

The Authority, which was created by the Massachusetts Legislature in 1960 to provide ferry service to the islands of Martha's Vineyard and Nantucket, "services members from all walks of life, including young children, elderly individuals[,] and the immunocompromised." Kennefick Decl. ¶¶ 3-5, 11. Because the Authority's mission is to provide public transportation, many of the Authority's 750 employees, "including each of the [p]laintiffs, regularly interact with fellow employees, customers[,] and/or vendors as part of their core job responsibilities." *Id.* ¶ 20.

On January 3, 2022, the Authority issued a COVID-19 Vaccination Verification Policy (the Policy) covering all employees. *Id.* ¶ 27. The Policy is modeled on Governor Charles Baker's Executive Order No. 595, which declares that "widespread vaccination is the only means the Commonwealth has over the long-term to ensure protection from COVID-19 in all its variations and to end the many negative consequences COVID-19 produces in our daily lives," *id.* ¶ 21-22, and "encourages" independent state agencies and authorities to adopt a similar omnibus policy. *Id.* ¶ 23.

The Policy states that "all employees must receive at least one (1) dose of a COVID-19 vaccine by January 5, 2022 and must be fully vaccinated by February 16, 2022." *Id.* ¶ 28. Employees who refuse the vaccine are subject to progressive disciplinary steps, up to and including termination.[2] *Id.* ¶ 30. The Policy allowed for employees to seek medical or religious accommodations on a case-by-case basis. *Id.* ¶ 29.[3]

Most of the plaintiffs sought religious exemptions from the vaccination Policy. *Id.* ¶ 35. After a review of the plaintiffs' requests, which included the completion of a comprehensive questionnaire and a face-to-face interview, the Authority rejected the accommodation requests as imposing an undue hardship on day-to-day operations. *Id.* ¶¶ 35-51. More specifically, the Authority found that because of plaintiffs' public-facing roles, the requested

---

[2] At the outset, noncompliant employees are given the opportunity to voluntarily resign or request a voluntary unpaid leave of absence up to one year and placement on a recall list in the event they ultimately choose to be vaccinated. *Id.* ¶ 31. Nonexempt employees who do not resign are suspended without pay – initially for five days, and then for ten days. *Id.* ¶ 32. These employees receive a hearing before their ten-day suspension. *Id.*

[3] Teamsters Union Local No. 59 – which represents all the plaintiffs – bargained on plaintiffs' behalf and eventually entered a Memorandum of Understanding with the Authority stating that "[e]ffective February 16, 2022, COVID-19 vaccination will be considered part of an employee's fitness for duty." *Id.* ¶ 33. The Memorandum continues: "Only fully vaccinated employees may be permitted to work at the Authority's vessels or facilities." *Id.*

exemptions would "unreasonably risk" the health and safety of fellow employees, customers, vendors, and the plaintiffs themselves, and thereby "undermine public trust and confidence in the safety of the Authority's facilities and vessels." *Id.* ¶ 52.

On February 11, 2022, plaintiffs filed an action in Barnstable Superior Court seeking injunctive and declaratory relief. The Authority then removed the case to this federal district court. Plaintiffs now renew their motion for preliminary injunctive relief.

## DISCUSSION

"A preliminary injunction is an 'extraordinary and drastic remedy'" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 690-691 (2008) (internal citation omitted). In determining whether to grant a preliminary injunction, the court must weigh: "(1) the likelihood of the movant's success on the merits; (2) the potential for irreparable harm to the movant; (3) a balancing of the relevant equities . . . ; and (4) the effect on the public interest of a grant or denial of the injunction." *Gately v. Commonwealth of Mass.*, 2 F.3d 1221, 1224 (1st Cir. 1993). That said, the "*sine qua non* of [the preliminary injunction standard] is whether the plaintiffs are likely to succeed on the merits." *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993).

Plaintiffs allege that the Authority's Policy violates four of their statutory and constitutional rights under state and federal law: (1) the right to religious worship secured by Article 2 of the Massachusetts Declaration of Rights; (2) the right to free religious exercise guaranteed by the First Amendment to the United States Constitution; (3) the right to be free of religious discrimination as guaranteed by Mass. Gen. Laws c. 151B, § 4; and (4) the rights to privacy, personal autonomy, and personal identity secured under the Fourteenth Amendment. The court discusses the likelihood of success on each claim in turn.

*Count I – Article 2 of the Massachusetts Declaration of Rights*

Article 2 of the Massachusetts Declaration of Rights provides:

> [N]o subject shall be hurt, molested, or restrained, in his person, liberty, or estate, for worshipping GOD in the manner and season most agreeable to the dictates of his own conscience; or for his religious profession or sentiments; provided he doth not disturb the public peace, or obstruct others in their religious worship.

Plaintiffs' reading of this provision as encompassing protection over the free exercise of religion essentially conflates Article 2 with the Free Exercise Clause of Article 46, § 1, of the Massachusetts Constitution – an approach that the Massachusetts Supreme Judicial Court has expressly rejected. *See Soc'y of Jesus of New Eng. v. Comm.*, 441 Mass. 662, 676 (2004) ("This expansive reading of art. 2 would conflate it with the free

exercise clause of art. 46, § 1, and effectively render the free exercise clause superfluous.").[4]

Moreover, not all actions grounded on religious belief qualify as "worship[]" under Article 2. *Id.* at 677. Indeed, "the essentially absolute protection of [Article 2 is] directed at the *ritual and ceremonial aspects* of 'worship[].'" *Id.* (emphasis added). Plaintiffs do not allege that the Policy trenches on any religious ritual. Thus, their prospects for success on their Article 2 claim are negligible at best.[5]

*Count II – 42 U.S.C. § 1983 (Free Exercise Under First Amendment)*

Plaintiffs next contend that the Policy – as well as the Authority's denial of plaintiffs' request for religious exemptions – contravenes their right to the free exercise of religion secured by the First Amendment, in violation

---

[4] Plaintiffs do not assert a free exercise claim under the Massachusetts Constitution in their Complaint.

[5] Alternatively, the Authority argues that plaintiffs' claim is barred by the Eleventh Amendment. *See O'Brien v. Mass. Bay Transp. Auth.*, 162 F.3d 40, 44 (1st Cir. 1998) ("[I]t is not the proper purview of a federal court to supervise state officials' compliance with state law."). Plaintiffs counter that because the Authority is a "public instrumentality of the Commonwealth," and not a state executive or administrative agency, the Eleventh Amendment does not apply. Reply (Dkt # 17) at 16. The court need not resolve this issue, because the court concludes that plaintiffs' claim fails whether or not it is barred by the Eleventh Amendment.

of 42 U.S.C. § 1983.[6]  Under the Free Exercise Clause, the government may not "(1) compel affirmation of religious beliefs; (2) punish the expression of religious doctrines it believes to be false; (3) impose special disabilities on the basis of religious views or religious status; or (4) lend its power to one side or the other in controversies over religious authorities or dogma." *Parker v. Hurley*, 514 F.3d 87, 103 (1st Cir. 2008).  "The First Amendment's prohibition on laws 'prohibiting the free exercise' of religion is incorporated against the states by the Fourteenth Amendment." *Freedom from Religion Found. v. Hanover Sch. Dist.*, 626 F.3d 1, 14 (1st Cir. 2010), quoting *Cantwell v. Conn.*, 310 U.S. 296, 303 (1940).

As another judge of this court has concluded in a similar case, the Commonwealth (and, by extension, the Authority) "is under no constitutional obligation to offer a religious exemption to its [v]accine [r]equirement."  *Harris v. Univ. of Mass., Lowell*, 2021 WL3848012, at *7 (D. Mass. Aug. 27, 2021), citing *Nikolao v. Lyon*, 875 F.3d 310, 316 (6th Cir.

---

[6] The Authority raises another substantial threshold matter as a bar to plaintiffs' § 1983 claims – namely, that the Authority, as a state agency, as well as co-defendant Janice Kennefick, in her official capacity as a state official, are not "persons" within the meaning of § 1983 and thus are immune from suit.  *See Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989). Plaintiffs again argue that the Authority is an independent entity from the Commonwealth and therefore not shielded by the Eleventh Amendment. The court again need not resolve this issue as the First Amendment claims fail in either instance.

2017); *Phillips v. City of N.Y.*, 775 F.3d 538, 543 (2d Cir. 2015); *Workman v. Mingo Cty. Bd. Of Educ.*, 419 F. App'x 348, 355 (4th Cir. 2011); *Whitlow v. Cal.*, 203 F. Supp. 3d 1079, 1086 (S.D. Cal. 2016).

Of course, where – as here – a state agency "offers religious exemptions, it must not administer them in an unconstitutional way." *Harris*, 2021 WL 3848012, at *7. Plaintiffs have not alleged any facts that suggest that the Authority has "administered its religious exemption policy in a way that burdens some religions but not others, or that [the Authority has] coerced [plaintiffs] in [their] religious practices." *Id.* (internal citations omitted). Thus, plaintiffs' free exercise claim fails at this stage.

*Count III – Religious Discrimination Under Mass. Gen. Laws c. 151B*

Plaintiffs maintain that the Authority's failure to accommodate their religious objections to the Policy amounts to religious discrimination under Mass. Gen. Laws c. 151B, § 4. Chapter 151B utilizes an evaluative framework identical to the one applied in federal Title VII accommodation cases. *See Mekonnen v. OTG Mgmt., LLC*, 394 F. Supp. 3d 134, 157 (D. Mass. 2019). "The employee bears the initial burden of establishing a prima facie case that the employer required the employee to violate a required religious practice," and "'that he or she gave the employer the required notice of the religious obligations.'" *Brown v. F.L. Roberts & Co., Inc.*, 452 Mass. 674, 676 (2008),

9

quoting *N.Y. & Mass. Motor Serv., Inc. v. Mass. Comm'n Against Discrimination*, 401 Mass. 566, 576 (1988). The plaintiff must assert "that a *bona fide* religious practice conflicts with an employment requirement and was the reason for the adverse employment action." *Sanchez-Rodriguez v. AT&T Mobility P.R., Inc.*, 673 F.3d 1, 12 (1st Cir. 2012). A *bona fide* practice is one that is both "religious" and "sincerely held." *EEOC v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de P.R.*, 279 F.3d 49, 56 (1st Cir. 2002). "If the employee makes this prima facie case, the burden then shifts to the employer 'to prove that accommodation of the [employee's] religious obligations would impose . . . an undue hardship' pursuant to the statute." *Brown*, 452 Mass. at 676, quoting *N.Y. & Mass. Motor Serv., Inc.*, 401 Mass. at 576.

At the outset, the record suggests that plaintiffs' opposition to receiving the COVID-19 vaccine is based primarily on "philosophical, medical, or scientific beliefs, or personal fears or anxieties" rather than *bona fide* religious practices. *Together Employees v. Mass Gen. Brigham Inc.*, 2021 WL 5234394, at *16 (D. Mass. Nov. 10, 2021) (rejecting preliminary relief for

employees who were denied a religious exemption from the hospital's COVID-19 vaccination policy).⁷

Even assuming *arguendo* that plaintiffs have established a prima facie case of religious discrimination, the Authority has readily demonstrated that accommodating plaintiffs' religious obligations would impose an undue hardship. "An accommodation constitutes an 'undue hardship' if it would impose more than a *de minimis* cost on the employer." *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 134 (1st Cir. 2004). In conducting an undue hardship inquiry, the court must consider "not only include direct economic costs, but indirect ones related to health and safety." *Together Employees*, 2021 WL 5234394, at *11.

In rejecting plaintiffs' requests for religious exemptions, the Authority "determined that the [p]laintiffs' unvaccinated status would compromise the

---

⁷ The reasons offered by plaintiffs in explaining their opposition to the Policy have no grounding in religious practice but are rather expressions of idiosyncratic personal belief. They include: "Jesus tells me that it is unwise to put the COVID vaccine into my body, his creation;" "I am afraid that it will kill me;" "Using genetically engineered envelopes such as mRNA that has shown ineffectiveness to work as intended to trick our bodies to fight somethings [sic] that we were made to defend goes against why God created us the way He did;" "I believe my God will guide me and protect me and [God] has told me not to get the vaccine at this time;" "I worship nature and believe in the use of natural medicine to keep myself healthy;" and "I have a strong belief thant [sic] natural & ancient remedies are what God intended me to use, to prevent and help cure illness." *See* Compl. (Dkt # 1) Exs. 3 & 4.

health, safety and well-being of other employees, customers and vendors, and undermine trust and confidence in the safety of its facilities and vessels." Opp'n (Dkt # 15) at 26. The Authority has articulated harms that it would incur in exposing its patrons to unvaccinated employees, including the risk to public health and safety, the Authority's reputation as a steward of the public welfare, and its financial interests,[8] harms that cannot be dismissed as *de minimis*. Plaintiffs thus are unlikely to prevail on their failure to accommodate claim. *See Cloutier*, 390 F.3d at 134.

*Count IV - 42 U.S.C. § 1983 (Fourteenth Amendment)*

Finally, plaintiffs allege that the Policy violates their rights to privacy, personal autonomy, and personal identity under the Fourteenth Amendment, in contravention of 42 U.S.C. § 1983. Plaintiffs are mistaken. In *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), the Supreme Court "rejected the idea of a fundamental right to refuse vaccination." *See Mass. Corr. Officers Federated Union v. Baker*, 2021 WL 4822154, at *6 (D. Mass. Oct. 15, 2021). Justice Harlan, in explaining the Court's reasoning for

---

[8] The Authority also cites the costs it would incur in paying personnel to "police" the faithful wearing of masks by unvaccinated employees, as well as the costs of paying employees overtime for filling in for unvaccinated employees who test positive for COVID-19 (unvaccinated employees who test positive must immediately leave work and cannot return until they present a negative PCR test). *See* Opp'n at 27.

rejecting a Cambridge resident's request to avoid vaccination against smallpox, stated bluntly:

> We are not prepared to hold that a minority, residing or remaining in any city or town where smallpox is prevalent, and enjoying the general protection afforded by an organized local government, may thus defy the will of its constituted authorities, acting in good faith for all, under the legislative sanction of the state. If such be the privilege of the minority, then a like privilege would belong to each individual of the community, and the spectacle would be presented of the welfare and safety of an entire population being subordinated to the notions of a single individual who chooses to remain party of that population. *We are unwilling to hold it to be an element in the liberty secured by the Constitution of the United States that one person, or a minority of persons, residing in any community and enjoying the benefits of its local government, should have the power thus to dominate the majority when supported in their action by the authority of the state.*

*Jacobson*, 197 U.S. at 37-38 (emphasis added); *see Klaasen v. Trs. of Ind. Univ.*, 7 F.4th 592, 593 (7th Cir. 2021) (in light of *Jacobson*, "there can't be a constitutional problem with vaccination against SARS-CoV-2").

This case is even more straightforward. The Authority is not requiring "every adult member of the public to be vaccinated, as Massachusetts did in *Jacobson*." *Klaassen*, 7 F.4th at 593. Rather, vaccination is a "condition" of employment with the Authority. *Id.* "People who do not want to be vaccinated may want to go elsewhere. Many [employers] require vaccination against SARS-CoV-2, but many others do not. Plaintiffs have ample [employment] opportunities." *Id.*

13

Plaintiffs' arguments to the contrary are unconvincing. In a puzzling and misplaced reliance on *Obergefell v. Hodges*, 576 U.S. 644 (2015), the seminal case in which the Supreme Court held that same-sex couples have a fundamental right to marry, plaintiffs maintain that they have a similar fundamental right to assert their personal identity and autonomy by refusing the COVID-19 vaccine. Plaintiffs point to the Court's statement that fundamental liberties under the Due Process Clause "extend to certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs." *Id.* at 663. From that language, they conflate the right to marry (which implicates no public or personal risk) with the right to refuse vaccination (which does). Plaintiffs ignore the Court's earlier teaching that "[h]istory and tradition," which "guide and discipline [the] inquiry" into whether a personal interest implicates a fundamental right, essentially foreclose the recognition of vaccine aversion as a fundamental liberty interest. *Id.*; *see also Jacobson*, 197 U.S. at 31-32 ("[T]he principle of vaccination as a means to prevent the spread of smallpox has been enforced in many states by statutes making the vaccination of children a condition of their right to enter or remain in public schools."); *Zucht v. King*, 260 U.S. 174, 176 (1922) ("[I]t is within the police power of a state to provide for compulsory vaccination."); *Klaassen*, 7 F.4th

14

at 593 ("[V]accination requirements, like other public-health measures, have been common in this nation.").

Plaintiffs' contention that they have a fundamental right of bodily integrity in refusing the COVID-19 vaccine is equally faulty. In support of their position, plaintiffs point to *United States v. E. Husband*, 226 F.3d 626 (7th Cir. 2000), in which the Seventh Circuit stated that "[b]ecause any medical procedure implicates an individual's liberty interests in personal privacy and bodily integrity, the Supreme Court has indicated that there is 'a general liberty interest in refusing medical treatment.'" *Id.* at 632, quoting *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990).

Plaintiffs have misinterpreted the Supreme Court's recognition of a "*general* liberty interest in refusing medical treatment" as a *fundamental* liberty interest. *Cruzan*, 497 U.S. at 278 (emphasis added). The difference is significant. Where – as here – the court evaluates the constitutionality of a potential encroachment upon a general liberty interest, the court need only consider whether the Policy "lacks a 'real or substantial relation' to public health and safety, whether the . . . Policy is 'beyond all question, a plain palpable invasion of rights secured by fundamental law' and whether it is so arbitrary and oppressive as to warrant judicial interference." *Harris*, 2021 WL 3848012, at *6, quoting *Jacobson*, 197 U.S. at 26.

The court has no doubt that the Policy has a "real and substantial relation" to public health and safety and is not a "palpable invasion of [plaintiffs'] rights." *Jacobson*, 197 U.S. at 26. "Stemming the spread of COVID-19 is unquestionably a compelling interest." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam). And the Policy, which is crafted to protect the Authority's staff and patrons from COVID-19, unquestionably bears a substantial relation to that interest. Moreover, the Policy does not invade plaintiffs' rights to refuse medical treatment as "nothing in the [P]olicy compels employees to submit to vaccination." *Local 589, Amalgamated Transit Unit v. Mass. Bay Transp. Auth.*, 2021 WL 6210665, at *6 (Mass. Super. Dec. 22, 2021). "Rather, the [P]olicy coerces employees to be vaccinated but does not force them." *Id.* Because the Policy does not violate any of plaintiffs' fundamental rights under the Fourteenth Amendment, plaintiffs' claim cannot succeed.

*Irreparable Harm, Balance of Harms, and Public Interest*

As plaintiffs "cannot demonstrate that [they are] likely to succeed in [their] quest [for injunctive relief], the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). Nevertheless, the court will briefly touch on these factors, noting that they do not weigh in favor of granting plaintiffs' motion.

Although several plaintiffs will be terminated (harmed) if they continue to defy the Policy, four of the eleven plaintiffs are now vaccinated and will not be terminated. *See* Kinnefick Decl. ¶¶ 57-60. Additionally, "the balance of equities tips in [the Authority's] favor given the strong public interest they are promoting" – protecting the health and safety of their crews and passengers from the spread and severity of COVID-19. *Harris*, 2021 WL 3848012, at *8. Finally, the public interest in safely accessing ferry service to Nantucket Island and Martha's Vineyard without the fear of contracting COVID-19 from the Authority's unvaccinated employees is profound.

A final word. Undergirding much of the plaintiffs' quest for injunctive relief is the scientifically unsupportable theory that the COVID-19 vaccines are, at best, wholly ineffective or, at worst, a hoax. Indeed, plaintiffs refuse to even recognize the vaccines *as* vaccines. *See* Reply at 9 n.3. At the extreme, plaintiffs advance the fabulous proposition that vaccinated persons are at higher risk of contracting COVID-19 than those who are not. *Id*. at 10 ("[A]fter 3 months, the vaccinated were more likely to contract COVID-19.").

It is a matter of utmost urgency that these dangerous and fallacious assertions be laid to rest. The CDC has determined – and no responsible world health organization or scientific body disagrees – that the COVID-19 vaccines are safe and effective against the virus and its variants, especially in

protecting against "severe illness, hospitalization, and death." Kennefick Decl. Ex. E at 61.[9]  The danger to the public is not the vaccine but persons who, like the plaintiffs, insist on behaviors that endanger all those with whom they have contact.  Although perhaps wrongly attributed to the great Justice Holmes, there is Holmesian wisdom in the adage that "your liberty to swing your fist ends where my nose begins."

## ORDER

For the foregoing reasons, plaintiffs' renewed motion for preliminary injunctive relief is <u>DENIED</u>.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

---

[9] Plaintiffs' assertion that "[n]one of the available COVID-19 vaccines prevent viral infection and/or transmission," Compl. at 16, is confounded by the opinion piece that plaintiffs cite in support of that proposition. *See* Montagnier & Rubenfeld, Opinion, *Omicron Makes Biden's Vaccine Mandates Obsolete*, Wall St. J. (Jan. 9, 2022) ("There is some early evidence that boosters may reduce Omicron infections . . . .").