UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 22-10242-RGS

CAPTAIN ALBERT BROX et al.

v.

THE WOODS HOLE, MARTHA'S VINEYARD, AND
NANTUCKET STEAMSHIP AUTHORITY and
JANICE KENNEFICK

MEMORANDUM AND ORDER ON
PLAINTIFFS' RENEWED MOTION FOR
PRELIMINARY INJUNCTIVE RELIEF

December 11, 2023

STEARNS, D.J.

Plaintiffs, who are eleven current and former employees of the Woods Hole, Martha's Vineyard, and Nantucket Steamship Authority (Authority), claim that the Authority infringed on their constitutional and statutory rights by implementing a policy (Policy) requiring that they be vaccinated against COVID-19 to maintain their employee status at the Authority unless qualified for a medical or religious exemption. Plaintiffs each submitted requests to be exempt from the Policy on religious grounds. The Authority denied each

of their requests.[1] Plaintiffs claim that the Policy violates their right to free exercise of religious worship under Article 2 of the Massachusetts Declaration of Rights (Count I); the First Amendment's Free Exercise Clause (Count II); the Massachusetts Unlawful Discrimination Law, Mass. Gen. Laws ch. 151B, § 4 (Count III); and their Fourteenth Amendment due process rights to privacy, personal autonomy, and personal identity (Count IV). They seek preliminary injunctive relief from enforcement of the Policy.

Plaintiffs first moved for a preliminary injunction on February 18, 2022. The court denied the motion on March 10, 2022, and plaintiffs timely appealed on April 7, 2022. On October 6, 2023, the First Circuit affirmed the court's denial of preliminary injunctive relief as to Counts I, III, and IV and vacated the court's denial as to Count II, directing the court to consider the appropriate level of scrutiny to apply to plaintiffs' free exercise claims and to determine "how [the First Circuit's] decisions in *Mills* and *Lowe* bear on appellants' request for such relief." *Brox v. Woods Hole, Martha's Vineyard & Nantucket Steamship Auth.*, 83 F.4th 87, 100 (1st Cir. 2023). After careful consideration of the parties' initial and renewed briefing and

---

[1] Four plaintiffs subsequently agreed to be vaccinated and remained employed by the Authority. Seven plaintiffs refused vaccination and were terminated.

the impact of *Mills* and *Lowe* on plaintiffs' claims, the court will DENY plaintiffs' renewed motion for preliminary injunctive relief.

## BACKGROUND

### *COVID-19 Pandemic*[2]

The COVID-19 pandemic is among the deadliest pandemics in human history. The disease spread rapidly throughout the world and to date has killed over one million Americans, including 25,000 Massachusetts residents. To combat the spread of the virus, the United States Food and Drug Administration (FDA) granted emergency use authorizations (EUAs) to COVID-19 vaccines manufactured by Pfizer/BioNTech (Pfizer Vaccine) and Moderna (Moderna Vaccine) in December of 2020 and to a vaccine manufactured by Janssen Biotech, Inc. (Janssen Vaccine) in February of 2021.[3]

---

[2] The court draws much of this background from the websites of the Center for Disease Control and Prevention (CDC) and the United States Food and Drug Administration (FDA). Because the accuracy of this information "cannot reasonably be questioned," the court may take judicial notice of these facts. Fed. R. Evid. 201(b)(2); *see also Pietrangelo v. Sununu*, 2021 WL 4487850, at *1 n.1 (1st Cir. Oct. 1, 2021) (taking judicial notice of "state and federal vaccine distribution data" at preliminary injunction stage); *Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (taking judicial notice of information on CDC's website).

[3] *See* Press Release, U.S. FDA, FDA Approves First COVID-19 Vaccine (Aug. 23, 2021), https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine (Pfizer Press Release); Press Release,

Before granting full approval of the Pfizer and Moderna Vaccines, the FDA reviewed "hundreds of thousands of pages" of data and conducted independent analyses of the Vaccines' safety and effectiveness.[4] The FDA concluded that the Pfizer and Moderna Vaccines met its "high standards for safety, effectiveness, and manufacturing quality" and gave full approval to the Pfizer Vaccine on August 23, 2021, and to the Moderna Vaccine on January 31, 2022.[5]

The Vaccines are extremely effective.[6] But, as is common with vaccines, the immunity generated by the Vaccines wanes over time. Accordingly, in September of 2021, the FDA approved "booster" doses of the

---

U.S. FDA, Coronavirus (COVID-19) Update: FDA Takes Key Action by Approving Second COVID-19 Vaccine (Jan. 31, 2022), https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-takes-key-action-approving-second-covid-19-vaccine (Moderna Press Release); 86 Fed. Reg. 28608 (May 27, 2021).

At Janssen's request, the FDA revoked the EUA for the Janssen vaccine on June 1, 2023. *Jannsen COVID-19 Vaccine*, U.S. FDA, https://www.fda.gov/vaccines-blood-biologics/coronavirus-covid-19-cber-regulated-biologics/janssen-covid-19-vaccine (last updated June 2, 2023).

[4] Pfizer Press Release (emphasis omitted); *see also* Moderna Press Release.

[5] Moderna Press Release (emphasis omitted); *see also* Pfizer Press Release.

[6] *See COVID-19 Vaccine Effectiveness Update*, CDC (Aug. 31, 2023), https://covid.cdc.gov/covid-data-tracker/#vaccine-effectiveness.

Pfizer and Moderna Vaccines, and it has since approved additional booster doses.[7]  Although the CDC encourages vaccinated individuals to receive booster doses to bolster their immunity, it considers individuals fully vaccinated if they received the initial two-dose series of the Pfizer or Moderna Vaccine or one dose of a single-dose COVID-19 vaccine, such as the Janssen Vaccine.[8]  Since the advent of the widespread use of the Vaccines, COVID-19 infections and deaths have decreased significantly.

### *The Policy*

The Authority, which the Massachusetts Legislature created in 1960 to provide ferry service to the islands of Martha's Vineyard and Nantucket, "serves members from all walks of life, including young children, elderly individuals and the immunocompromised." Decl. of Janice Kennefick in Opp'n to Pls.' Mot. for a Prelim. Inj. (Kennefick Decl.) (Dkt. # 16) ¶¶ 3-5, 11. Many of the Authority's 750 employees, including plaintiffs, "regularly

---

[7] *See* Press Release, U.S. FDA, FDA Authorizes Booster Dose of Pfizer-BioNTech COVID-19 Vaccine for Certain Populations (Sept. 22, 2021), https://www.fda.gov/news-events/press-announcements/fda-authorizes-booster-dose-pfizer-biontech-covid-19-vaccine-certain-populations.

[8] *Data Definitions for COVID-19 Vaccinations in the United States*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/reporting-vaccinations.html (last updated Oct. 13, 2023).

5

interact with fellow employees, customers and/or vendors as part of their job responsibilities." *Id.* ¶ 20.

On January 3, 2022, the Authority notified employees of the Policy.[9] *Id.* ¶ 27. The Policy was created "to prevent viral infection and transmission,"[10] and it required all employees to "receive[] at least one COVID-19 vaccination by . . . January 5, 2022" and to be "fully vaccinated in accordance with the CDC definition on or before February 16, 2022." *Id.*, Ex. F (Policy) at 1-2 (emphasis omitted). The Policy permitted two types of exemptions: First, if an employee provided documentation from a healthcare provider that the vaccine was medically contraindicated, they could qualify for an exemption. *Id.* at 3. Second, an employee who "object[ed] to vaccination due to a sincerely held religious belief" could also qualify for an

---

[9] The Authority modeled the Policy after then-Governor Charlie Baker's Executive Order No. 595, which required all executive department employees to be vaccinated against COVID-19 because "widespread vaccination is the only means the Commonwealth has over the long term to ensure protection from COVID-19." Kennefick Decl. ¶ 21-22. Executive Order No. 595 "encouraged" independent state agencies and authorities, such as the Authority, to adopt a similar policy. *Id.* ¶¶ 21-23.

[10] The Authority articulates a slightly broader interest in enacting the Policy – "protecting the health and safety of its employees and customers," Defs.' Renewed Opp'n at 1, 9, 10 – and plaintiffs accuse it of engaging in a "*post-hoc* reimagining" of its asserted interest, Renewed Mot. for Prelim. Inj. at 6. Because preventing infection and transmission is a legitimate interest, the court need not address this broader framing.

6

exemption. *Id.* at 4. Employees who remained unvaccinated and who were not approved for an exemption were subject to progressive discipline, "up to and including termination." *Id.*

Nine plaintiffs timely sought religious exemptions from the Policy.[11] Pls.' Br. in Supp. of Renewed Mot. for Inj. Relief (Mot. for Prelim. Inj.) (Dkt. # 10) at 5. The Authority reviewed the requests, conducted in-person interviews of the plaintiffs, and ultimately rejected each of the requests. Kennefick Decl. ¶¶ 35-52. The Authority explained that plaintiffs' jobs required them to "regularly interact with others in physically enclosed spaces onboard the vessel," engage in "significant in-person customer service" such that "social distancing is at times impossible," and "interact[] and interfac[e] with customers and other employees." *Id.* ¶¶ 40-48. It thus concluded that "exemptions from the Policy for these individuals would unreasonably risk their own health and safety as well as the health and safety of fellow employees, customers and/or vendors" and "undermine public trust and confidence in the safety of the Authority's facilities and vessels." *Id.* ¶ 52.

---

[11] Jeffrey D'Amario and Sonia Simoneau sought religious exemptions approximately one month after the deadline to submit exemption requests. Kennefick Decl. ¶ 48.

## DISCUSSION

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The court's discretion to issue preliminary injunctive relief "is 'to be used sparingly, and only in a clear and plain case.'" *Rizzo v. Goode*, 423 U.S. 362, 376 (1976), quoting *Irwin v. Dixon*, 50 U.S. (9 How.) 10, 33 (1850). In exercising this discretion, the court weighs four factors: "(1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest." *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 171 (1st Cir. 2015). The first factor is the "sine qua non" of the analysis; "if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). Plaintiffs bear the burden of establishing that these factors weigh in their favor. *Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006).

The Free Exercise Clause of the First Amendment, incorporated into State law by the Fourteenth Amendment, "'protects religious observers against unequal treatment' and against 'laws that impose special disabilities

8

on the basis of religious status.'" *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2254 (2020), quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017). A facially neutral and generally applicable policy that "incidentally burdens free exercise rights" does not violate the First Amendment "if it is rationally related to a legitimate governmental interest." *Does 1-6 v. Mills*, 16 F.4th 20, 29 (1st Cir. 2021). But a policy that burdens religious practice that is "not neutral or not of general application" is subject to strict scrutiny, meaning it "must advance 'interests of the highest order' and must be narrowly tailored in pursuit of those interests." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993), quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978).

A generally applicable policy is one that does "not selectively burden religiously motivated conduct while exempting comparable secularly motivated conduct." *Mills*, 16 F.4th at 29. A policy is thus not generally applicable if it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021); *see also Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam) (a policy is not generally applicable if it "treat[s] *any* comparable secular activity more favorably than religious exercise").

The First Circuit recently decided two cases involving First Amendment challenges to COVID-19 vaccination policies. In *Mills*, the First Circuit considered the State of Maine's vaccination policy that required all workers in licensed healthcare facilities to be vaccinated against COVID-19 subject only to a medical exemption. 16 F.4th at 24. The plaintiffs, healthcare workers who objected to vaccination on religious grounds, sought preliminary injunctive relief from enforcement of the policy. The Maine district court denied the request. The First Circuit concluded that the policy was subject to rational basis review because it was both neutral, as the State did not "single[] out religious objections to the vaccine '*because of* their religious nature,'" and generally applicable, because it allowed for "a single objective exemption" and did not "permit 'secular conduct that undermines the government's asserted interest in a similar way.'" *Id.* at 30, quoting *Fulton*, 141 S. Ct. at 1877. Finding that the policy "easily satisfies rational basis review," the First Circuit affirmed the district court.[12] *Id.* at 32.

In *Lowe v. Mills*, 68 F.4th 706 (1st Cir. 2023), the First Circuit again considered Maine's vaccination policy for healthcare workers, this time at

---

[12] The First Circuit noted that even if strict scrutiny applied, the plaintiffs still had no likelihood of success on the merits because "[f]ew interests are more compelling than protecting public health against a deadly virus" and Maine "reasonably used all the tools available to fight contagious diseases." *Mills*, 16 F.4th at 32.

the motion-to-dismiss stage. Although *Lowe* involved the same plaintiffs who challenged the same policy as in *Mills*, the First Circuit explained that *Mills* did not control "because the different procedural postures implicate different burdens, standards of review, and factual records." *Id.* at 712 n.10. Applying the deferential Rule 12(b)(6) standard, the First Circuit found that the plaintiffs plausibly alleged that the policy was not generally applicable (thus strict scrutiny applied) and stated a claim that Maine's policy did not satisfy strict scrutiny. *Id.* at 714, 717. But the Court was careful to "emphasize the narrowness of [its] holding"; it "[did] not determine what standard of scrutiny should ultimately apply to the free exercise claim," nor did it "decide whether the Mandate survives the applicable level of scrutiny." *Id.* at 718.

### *Likelihood of Success on the Merits*

To assess plaintiffs' likelihood of success on the merits, the court must first determine the level of scrutiny that applies to their claims. The burden of demonstrating that strict scrutiny applies rests with plaintiffs.[13] If they carry this burden, the burden shifts to the Authority to show that the Policy satisfies strict scrutiny. *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022).

---

[13] Plaintiffs could also carry their burden by showing that the Policy fails rational basis review, but they do not make that argument.

Plaintiffs' only argument[14] that strict scrutiny applies is that the Policy is not generally applicable because "it permitted medical exemptions to persons who pose the same risk of spreading COVID-19 as similarly situated persons to whom defendants denied religious exemptions."[15] Pls.' Renewed Mot. for Prelim. Inj. Following the First Circuit's Remand (Renewed Mot. for Prelim. Inj.) (Dkt. # 38) at 5. To support this claim, plaintiffs cite to an affidavit from a former employee of the Authority, Greg Manchester, who requested both religious and medical exemptions from the Policy. Aff. of Greg Manchester (Manchester Aff.) (Dkt. # 17, Ex. 1) ¶¶ 5-6. The Authority

---

[14] In their Renewed Reply, plaintiffs argue that the Policy created a "system of individualized exemptions to be granted or denied on a case-by-case, discretionary basis." Pls.' Reply Mem. to Defs.' Opp'n to Pls.' Renewed Mot. for Prelim. Inj. (Renewed Reply) (Dkt. # 44) at 10. The Renewed Reply is the fourth brief that plaintiffs have filed before the court on this issue, but this is the first time they have made this argument. The argument is waived. *See Wills v. Brown Univ.*, 184 F.3d 20, 27 (1st Cir. 1999) ("[T]heories offered for the first time in the *reply* brief are not preserved."); *Noonan v. Wonderland Greyhound Park Realty LLC*, 723 F. Supp. 2d 298, 349 (D. Mass. 2010) ("The purpose of a reply memorandum is not to file new arguments that could have been raised in a supporting memorandum.").

[15] Elsewhere, plaintiffs contend that everyone, whether vaccinated or not, carries an equivalent risk of transmitting COVID-19 "given the vaccines' inability to inhibit transmission," and thus "[it] would be irrational, legally indefensible and contrary to the public interest for government to mandate vaccines." Renewed Mot. for Prelim. Inj. at 7. To the extent that plaintiffs mean to argue that the Authority cannot have acted pursuant to a legitimate or compelling interest because the Vaccines are not effective, this is belied by publicly available data. At any rate, the argument is too underdeveloped to merit further consideration.

12

granted him a brief medical exemption but denied his requested religious exemption. *Id.* ¶¶ 7, 10. Plaintiffs contend that this shows that the Policy is not generally applicable because, just as with plaintiffs, Manchester worked "in close contact with his colleagues and the public alike," yet the Authority granted him an exemption. Renewed Mot. for Prelim. Inj. at 5.

The Authority counters that the Policy is generally applicable, so rational basis review applies, because the Policy "does not target or selectively burden religious conduct." Defs.' Opp'n to Pls.' Renewed Mot. for Prelim. Injunctive Relief (Defs.' Opp'n) (Dkt. # 15) at 11 n.5; *see also* Defs.' Opp'n to Pls.' Renewed Mot. for Prelim. Inj. (Defs.' Renewed Opp'n) (Dkt. # 42) at 7. It argues that granting Manchester's medical exemption "furthered the Authority's goal of protecting the health and safety of its employees" but that granting plaintiffs' requested religious exemptions would not further this goal. Defs.' Renewed Opp'n at 9. Further, the Authority claims that plaintiffs' religious exemption requests are not comparable to Manchester's medical exemption request because Manchester's request is "(1) rarer, (2) more time-limited, and (3) more geographically insignificant than the eleven (11) religious exemption requests submitted by Plaintiffs." *Id.* at 14.

13

In considering the whole, the court concludes that rational basis is the applicable level of scrutiny.[16] Plaintiffs do not challenge that the Policy is neutral, and the court agrees that it is. And the Policy does not, facially or as applied to plaintiffs, permit "secular conduct that undermines the government's asserted interest in a similar way" as comparable religious conduct. *Fulton*, 141 S. Ct. at 1877; *see also Lukumi*, 508 U.S. at 543. The core problem with plaintiffs' argument is that the risks of granting Manchester a medical exemption are not comparable to those of granting plaintiffs their requested religious exemptions.

First, plaintiffs sought permanent exemptions from the Policy, but Manchester sought to work while unvaccinated for only three months and was only permitted to work while unvaccinated for six weeks. *See* Manchester Decl. ¶ 10. "Comparability is concerned with the risks various activities pose," and granting a six-week exemption poses a materially different risk than that posed by allowing plaintiffs to work while unvaccinated for an indefinite period. *Tandon*, 141 S. Ct. at 1296; *see also*

---

[16] The First Circuit's holding does not foreclose such a finding as plaintiffs suggest. *See* Renewed Reply at 2. Although the First Circuit found no independent grounds manifest in the record on which to affirm, *see Brox*, 83 F.4th at 98, circuit courts are of course limited to the records filed with them, and the record on remand differs in important ways from the appellate record. The record contains new, compelling evidence regarding the comparability of the requested exemptions that informs the court's finding.

14

*Lowe*, 68 F.4th at 715 (evidence that "medical exemptions are . . . more time limited" can show that "the two exemptions would not have comparable public health effects").

Second, the record shows that there were at least thirteen requests for religious exemptions (the eleven plaintiffs, Manchester, and one religious objector who could work fully remotely and received an exemption) and only one request for a medical exemption. The relevant comparison is not between one individual who is unvaccinated for religious reasons and one who is unvaccinated for medical reasons. Instead, "Supreme Court precedent 'suggests the appropriateness of considering aggregate data about transmission risks.'" *Lowe*, 68 F.4th at 716, quoting *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 287 (2d Cir. 2021); *see also Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66-67 (2020) (comparing a "large store in Brooklyn that could 'literally have hundreds of people shopping there on any given day'" with a "nearby church or synagogue [that] would be prohibited from allowing more than 10 or 25 people inside"). In the aggregate, granting plaintiffs' eleven exemptions poses a higher risk than granting one.[17] *See Lowe*, 68 F.4th at 715 (a showing that "medical

---

[17] Plaintiffs claim that, on this logic, "granting plaintiffs' exemption requests would have meant defendants had to contend with a 1,100% increase in the chance of COVID-19 spreading on defendants' vessels" and

15

exemptions are likely to be rarer" than religious exemptions can show the exemptions are not comparable).

The Policy easily satisfies rational basis review, meaning that plaintiffs are unlikely to succeed on the merits. Limiting COVID-19 infection and transmission is of course a legitimate governmental interest. *See Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 67; *Mills*, 16 F.4th at 32. And requiring all employees to be vaccinated, subject to limited exemptions, is rationally related to that interest. *See Mills*, 16 F.4th at 32.

In reply, plaintiffs make much of the fact that the Policy does not mirror the policy at issue in *Mills*. *See, e.g.*, Renewed Reply at 11-14. They argue that *Mills* is "starkly differ[ent]" than this case because (1) "there is no record to support a[] rationale that defendants' customers, employees, or facilities are or were similarly 'uniquely' vulnerable"; (2) Maine's policy offered only medical exemptions; and (3) the Authority did not suffer any hardship, such as a loss in ridership, by permitting employees to work while unvaccinated. *Id.* Regarding the first argument, one of Maine's stated

---

that Manchester alone created a 100% increase of transmission. Renewed Reply at 15-16. This is wrong as a mathematical and scientific matter, *see Lowe*, 68 F.4th at 716 ("[A]s an epidemiological matter, the number of people seeking exemptions" is relevant to "assessing the relative risks" of exemptions), quoting *We the Patriots*, 17 F.4th at 286-287, and completely overlooks the fact that the risks associated with granting Manchester's exemption were further mitigated because his exemption was time limited.

purposes in adopting its policy was to "protect[] the health of those in the state most vulnerable to the virus." *Mills*, 16 F.4th at 31. The Authority had no such purpose, so it is irrelevant that the record does not support it. As to the second argument, *Mills* did not hold that the only constitutional vaccination policy is Maine's, nor did it hold that including a religious exemption is unconstitutional. It merely explained that a generally applicable policy cannot "rest on assumptions about the public health impacts of various secular or religious activities." *Id.* As noted, the Policy does not. The third argument is also irrelevant. The Authority need not prove it faced a loss in ridership (or any hardship). It only needs to show that it has a legitimate government interest in implementing the Policy – preventing infection and transmission – which it did.

Although rational basis is the applicable level of scrutiny, even if strict scrutiny applied, plaintiffs still would not have carried their burden of showing they are likely to succeed on the merits.

To determine whether the Authority had a compelling interest in limiting COVID-19 infection and transmission, the question "is not whether the [Authority] has a compelling interest in enforcing [the Policy] generally, but whether it has such an interest in denying an exception" to plaintiffs. *Fulton*, 141 S. Ct. at 1881. The Authority has a compelling justification: as

discussed, granting eleven indefinite religious exemptions creates a substantially higher risk of infection and transmission than granting one time-limited medical exemption.

The Policy is also narrowly tailored. The Authority has shown that "measures less restrictive of the First Amendment activity could not address its interest in reducing the spread of COVID." *See Tandon*, 141 S. Ct. at 1296-1297. The Authority tried other, non-pharmaceutical measures to prevent infection and transmission of COVID-19, including "cleaning measures, social distancing, daily employee health screening, and additional payroll expenses and overtime, among other measures." Defs.' Renewed Opp'n at 16, citing Kennefick Decl. ¶ 12. The Authority also attempted to encourage its employees to become vaccinated by offering a $100 incentive to individuals who were vaccinated prior to the implementation of the Policy. *See* Policy at 2. Despite the Authority's efforts and over $1.5 million in expenditures, COVID-19 outbreaks on the Authority's vessels continued to occur. Defs.' Renewed Opp'n at 16; Kennefick Decl. ¶¶ 12-16.

The Authority further considered plaintiffs' requested accommodations of wearing masks and testing weekly for COVID-19. Kennefick Decl. ¶ 55. The Authority found that mask wearing was insufficient to mitigate infection and transmission and that it would be

18

difficult to police compliance with such a requirement. *Id.* As to weekly testing, the Authority concluded that testing would miss infections on days when employees were not tested. *Id.* The Authority thus "has no alternative to meet its goal other than mandating [its employees] to be vaccinated." *Mills*, 16 F.4th at 33.

Finally, the Policy is not overinclusive. It is applicable only to individuals who are employed by the Authority and thus "regularly interact with fellow employees, customers and/or vendors as part of their core job responsibilities." Kennefick Decl. ¶ 20. Nor is it underinclusive as it does not "fail to prohibit nonreligious conduct that endangers [the Authority's] interests in a similar or greater degree" than religious conduct does. *Lukumi*, 508 U.S. at 543. Whether the Policy is underinclusive turns on whether the religious and secular conduct are comparable. *Id.*; *Tandon*, 141 S. Ct. at 1297. The court has already concluded that they are not, and it need say no more.

### *Likelihood of Irreparable Harm, Balance of Equities, and the Public Interest*

Having concluded that plaintiffs are unlikely to succeed on the merits of their free exercise claim, the remaining preliminary injunction factors are "matters of idle curiosity." *New Comm Wireless Servs., Inc.*, 287 F.3d at 9. Plaintiffs contend that each of these factors weighs in their favor because the "loss of First Amendment freedoms" constitutes irreparable injury and tilts

19

the balance of equities in their favor, and because the public has an interest in "ensuring that [the government] follows the Free Exercise Clause." Renewed Mot. for Prelim. Inj. at 8-11, first quoting *Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 67, and then quoting *Doster v. Kendall*, 54 F.4th, 398, 428 (6th Cir. 2022). This is all correct as a doctrinal matter, but plaintiffs have not shown the prerequisite loss of protected First Amendment freedoms. The remaining preliminary injunction factors thus weigh in the Authority's favor.

## ORDER

For the foregoing reasons, plaintiffs' renewed motion for preliminary injunctive relief is <u>DENIED</u>.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE